2023 IL App (1st) 210921-U

No. 1-21-0921

Order filed January 17, 2023

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 8083 |
| | ) | |
| | ) | Honorable |
| AUSTIN DILLARD, | ) | Dennis J. Porter, |
| | ) | Michael R. Clancy |
| Defendant-Appellant. | ) | Judges, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Hyman concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm defendant's conviction for armed habitual criminal over his contention that the State failed to prove he constructively possessed a firearm. Defendant's request to proceed *pro se* was clear and unequivocal, and the trial court properly allowed him to represent himself after admonishing him pursuant to Illinois Supreme Court Rule 401 and ascertaining that he knowingly and voluntarily relinquished his right to counsel.

¶ 2   Following a bench trial, defendant Austin Dillard was found guilty of being an armed habitual criminal (AHC) (720 ILCs 5/24-1.7(a) (West 2016)) and eight firearm offenses that

merged into the AHC offense. The trial court sentenced defendant to seven years in prison on the AHC count. On appeal, defendant contends that (1) the State failed to prove his AHC conviction beyond a reasonable doubt where the evidence was insufficient to show he constructively possessed a handgun, and (2) the trial court erred in allowing him to proceed *pro se* where it failed to ensure he understood the right he was waiving and that his waiver was knowing and voluntary. For the following reasons, we affirm.

¶ 3    Defendant was charged, in pertinent part, with one count of AHC, which alleged he knowingly or intentionally possessed a firearm after having been convicted of delivery of a controlled substance and residential burglary. He was also charged with eight other firearms-related counts (two for unlawful use or possession of a weapon by a felon (UUWF) and six counts for aggravated unlawful use of a weapon (AUUW)), premised on possessing a firearm and ammunition found on the front passenger seat of a vehicle.

¶ 4    In August 2017, prior to trial, defendant's appointed counsel informed the court that defendant wished to proceed *pro se*. The court confirmed with defendant he wished to proceed *pro se*. The court then asked defendant his age, whether he had represented himself before, how far he went in school, and admonished him about the nine charges against him and their potential sentences. The court admonished defendant that AHC was a Class X felony that carried a sentence of 6 to 30 years in prison and the firearm offenses were also Class X based on his criminal background. Defendant indicated he understood the charges against him and informed the court that he had not represented himself in a criminal case before but had represented himself in a civil case.

¶ 5    The court then informed defendant that he had the right to have an attorney appointed at no cost. It further admonished, "Presenting a defense is not a simple matter of telling your story, but it requires that you obey certain various technical rules that govern the conduct of a trial. You're going to have to obey those rules, whether you know them or not. Do you understand that?" When defendant indicated he did not know the rules, the court told him that if he represented himself, he would still be required to follow them. The court also stated that the State would have an experienced lawyer, defendant's unfamiliarity with court rules might have unintended consequences, he would not be entitled to special treatment because he was not a lawyer, and the effectiveness of his defense could be diminished by his own representation.

¶ 6    The court informed defendant he would not be entitled to additional time to prepare, a lawyer could provide extra assistance by negotiating a lesser charge or sentence with the State or preparing a defense, defendant would not be able to change his mind once trial started, and he would not be appointed standby counsel. Defendant stated he understood the admonishments. However, he stated, "I was going to ask, do you think it's possible we can just get a short continuance until I see if I can find other representation? Because I'm not sure -- with all that being said, I'm not sure if I'll be able to stand up here and present a defense." The court continued the case. Defendant eventually hired private counsel to represent him.

¶ 7    In November 2018, the trial court granted private counsel leave to withdraw from the case, where counsel informed the court he had no contact with defendant "in several months" and their financial agreement had not been honored. Defendant informed the court, "I want another lawyer if I can, but if not, I will have to go *pro se*." When asked whether he had represented himself in a criminal case before, defendant said he was representing himself in another pending criminal case

in Markham. Defendant then declined the trial court's offer for time to hire other counsel and stated, "I would just like to go pro se so I can receive my discovery and see if I can get to trial." After the court confirmed with defendant that he had requested to proceed *pro se* about a year ago, the court stated, "we better go through it again then."

¶ 8 The court then admonished defendant that he was charged with being an AHC for knowingly and intentionally possessing a firearm after having been convicted of delivery of a controlled substance and residential burglary. Defendant indicated he did not "necessarily" understand the charge. The court clarified that he was charged with AHC because he "possessed a firearm with two prior qualifying felonies, residential burglary and delivery of a controlled substance. Defendant then stated he was "not actually understanding" whether the AHC charge was "a charge that can be applied at sentencing or an actual charge," and the court clarified, "That's the actual charge." Defendant responded, "Okay."

¶ 9 The court then explained each of the UUWF and AUUW charges separately. After each admonishment, it asked if defendant understood and defendant responded, "I believe so." The court explained that the AHC charge was a Class X felony and that, if convicted, defendant faced a sentence of not less than 6 and not more than 30 years, a 3-year mandatory supervised release period following incarceration, and a fine of up to $25,000. Regarding the UUWF and AUUW counts, the court explained "on each one of those, those are all Class 2 felonies" for which defendant faced sentences of not less than 3 and not more than 14 years, a 2-year mandatory supervised release, and fines of up to $25,000 on each count. When asked if he understood, defendant stated, "I believe so."

¶ 10    Additionally, the court informed defendant that if he had a previous conviction "for that same or greater class felony within the last 10 years, then any sentence in the penitentiary could be doubled." It explained that, for example, if defendant had a previous Class X felony conviction within the last 10 years, then his sentencing range would instead be from 6 to 60 years. Similarly, a prior Class 2 conviction within the last 10 years would result in a sentencing range "from 3 up to 28 years." Defendant responded, "28?" and the court asked whether he understood. Defendant stated, "I believe so."

¶ 11    When the court informed defendant he had the right to be "represented by an attorney of your choice on these charges," defendant asked, "An attorney of my choice? *** A licensed attorney that I could hire?" to which the court responded "Yes," and "If you want to hire somebody, you can hire whoever you want." Defendant then asked, "Or the public defender?" and the trial court stated, "Yes." The court stated it would appoint the public defender if defendant could not afford counsel and, if defendant chose not accept the public defender, he could represent himself *pro se* if he wanted. The court stated it did not recommend defendant do so, but he had that right. Defendant stated he believed he understood.

¶ 12    The court admonished defendant that if he went *pro se* he would have to follow the rules, and that a lawyer "can render important assistance by determining the existence of possible defenses" and consult with the State about possible reduced charges or penalties. A lawyer would additionally be able to present matters to the court which could lead to a lesser sentence, if he were convicted. The court informed defendant that if it allowed him to represent himself, he would not be permitted to change his mind during the trial, and standby counsel would not be appointed. After each admonishment, when asked if he understood, defendant stated, "I believe so."

¶ 13    Following the admonishments, the trial court asked defendant, "After everything I have said, do you still want to represent yourself?" Defendant replied, "To be honest after all that, I believe I understand most of it, I believe I do, but at this time I really would like a short continuance to think about it. *** Maybe see if I can hire new representation." The court granted defendant the two-week continuance he requested.

¶ 14    At the next court date in December 2018, defendant informed the court he would represent himself. Defendant confirmed that the court had twice admonished him (August 15 and November 26) about his "rights," and the court ordered the transcripts from the previous court dates to confirm.[1] The court then proceeded to the bond hearing defendant requested, at which defendant represented himself, and set a date for the State to tender discovery to defendant.

¶ 15    In July 2019, defendant represented himself at a hearing on his *pro se* motion to suppress evidence, in which he alleged that Chicago police officers violated his fourth amendment right when, in effectuating a traffic stop, they "demanded that [he] be removed from his vehicle without probable cause." At the hearing, defendant gave opening and closing arguments, called and extensively questioned a witness, and gave his own testimony. The court denied defendant's motion, finding the traffic stop was legal and the officers did not search his vehicle until after they had probable cause. Defendant continued to represent himself throughout his trial.

¶ 16    At trial, Chicago police officer Soto testified that, around 9:42 a.m. on May 12, 2017, he was on patrol in plain clothes with three other officers, Loeza, Ryan Graal, and Yanez.[2] Soto was

---

[1] While out on bond in the instant case, defendant was arrested for identity theft and had a pending criminal case in Markham.

[2] Officers Soto, Loeza, and Yanez's first names do not appear in the record. Officer Graal's name is also spelled throughout the record as "Grail" and "Guerro." We use the spelling specified by Graal in his trial testimony.

driving a police vehicle on the 5600 block of South Racine and observed a vehicle with no front license plate. Soto stopped the vehicle and approached the driver's side. Loeza also approached the driver's side, while Graal and Yanez approached the passenger side. The driver, whom Soto identified in court as defendant, was the sole occupant. Soto requested defendant's driver's license and proof of insurance. Defendant could only produce an Illinois state identification card. When defendant could not provide a driver's license, Soto asked him to exit the vehicle. As Soto opened the driver's door, defendant "placed the vehicle in drive, *** and fled northbound."

¶ 17    Soto and the other officers ran back to the police vehicle and pursued defendant in their vehicle. Defendant disregarded two traffic control devices before the vehicle "jump[ed]" onto a grassy parkway on Garfield Boulevard where it eventually came to a stop. Defendant exited the vehicle while it was still moving and continued fleeing on foot.

¶ 18    Yanez and Graal jumped out of the police vehicle and chased defendant on foot. Soto and Loeza remained in the vehicle to attempt to "cut him off." Eventually, Loeza detained defendant near the 400 block of West Garfield, approximately a block and a half away. Soto recognized defendant as the driver of the vehicle. The video from Soto's body-worn camera was admitted into evidence and published for the court.

¶ 19    This court has reviewed the video footage. The footage shows Soto is the driver of the police vehicle and pulls over after curbing another vehicle. Soto and three other officers approach the vehicle. Soto approaches the driver's side of the curbed vehicle, tells the driver to keep his hands up, and informs him he was stopped because the vehicle did not have a front license plate. Soto asks for the driver's license and insurance. The driver responds that he does not have his license and does not know where his insurance card is, and Soto asks him to step out of the vehicle.

The driver immediately drives away. Soto and the other officers return to their vehicle, and Soto gets into the back seat. The officers drive away. After a few seconds, the police vehicle stops, and Soto gets out of the vehicle and starts running. As Soto runs to a grassy area, defendant is sitting on the ground.

¶ 20    On cross-examination, Soto testified that Loeza was in the process of "running" defendant's state identification card when defendant immediately fled. Soto acknowledged that he did not know of any weapons in the vehicle.

¶ 21    Chicago police officer Loeza's testimony about the traffic stop was substantially similar to Soto's. He added that Soto handed him defendant's identification card and he went to the squad vehicle to do a name check. The identification listed defendant's name as "Dennis Crisler." As Loeza entered the identification number in the computer, he observed defendant's vehicle drive away. The other three officers got back into the police vehicle and Loeza pursued defendant. When the police vehicle was in an alley on Garfield Boulevard, Loeza observed defendant emerge from a gangway between two houses. Loeza exited the police vehicle and chased defendant on foot, eventually detaining him. The video from Loeza's body camera was admitted into evidence and published for the court.

¶ 22    This court has reviewed the video footage. The footage shows that Loeza is initially in the back seat of the police vehicle when it curbs another vehicle. Once that vehicle stops, Loeza gets out of the police vehicle and approaches the rear of the curbed vehicle behind the other officers. Soto hands Loeza the driver's identification card, and Loeza returns to the police vehicle. While in the driver's seat of the police vehicle, the other officers run back and get in. Loeza drives for a few seconds, stops, and some officers exit. Loeza continues driving and then gets out of the vehicle

and starts running after a man on the street. Loeza points his taser at the man, tells him to stop, and makes him sit on the ground.

¶ 23    On cross-examination, Loeza testified that he did not see defendant discard any items. He did not recover any items when he searched the area.

¶ 24    Chicago police officer Graal testified to a substantially similar version of events as Soto and Loeza. He added that during the traffic stop, he observed a sweatshirt on the front passenger seat of the vehicle. After Soto opened the driver's door, Graal attempted to open the passenger door when defendant, whom Graal identified in court, suddenly drove away, and the door handle broke off. Following the chase, Graal conducted a search of defendant's abandoned vehicle, which had been secured by other officers. Graal recovered a "high-point Charlie 9.9-millimeter semiautomatic handgun," which was loaded. The firearm was on the front passenger seat on top of a bookbag and underneath a sweatshirt. After transporting defendant to the police station, Graal learned his name.

¶ 25    The video from Graal's body camera was admitted into evidence and published for the court. This court has reviewed the video footage. The first part of the footage shows Graal getting out of the police vehicle and approaching the passenger side of the same curbed vehicle as in the Soto and Loeza's body camera footage. He shines a flashlight in the window and states he "can't see s***." The front passenger window rolls down and the vehicle suddenly speeds away. Graal returns to the back passenger seat of the police vehicle, which drives after the fleeing vehicle. When the police vehicle stops, Graal gets out and begins chasing the other vehicle and then, eventually, a fleeing man, on foot.

¶ 26    The second part of the footage shows Graal walking toward a vehicle parked on the grassy median. Graal explains to the other officers present where defendant ran and notes that the vehicle was not stolen. Graal and the other officers then start looking inside the vehicle.

¶ 27    On cross-examination, Graal testified that he personally recovered the firearm but acknowledged he was not the first to see the firearm.

¶ 28    The State introduced into evidence certified copies of defendant's prior convictions for residential burglary and delivery of a controlled substance.

¶ 29    Defendant did not present any evidence. During closing arguments, the State argued that defendant was in constructive possession of the firearm because he could have exerted control over the firearm at any time as it was located within arm's reach of defendant, who was the only individual in the vehicle, and the sweatshirt was the only reason the officers did not immediately observe the firearm. The State also argued that defendant's knowledge of the firearm was shown by his flight and providing officers with a false identification card. Defendant argued the State failed to prove that he constructively possessed the weapon because it did not demonstrate that he had knowledge of the firearm, which was concealed in the vehicle. He further argued that the reason he fled was because he was on parole at the time of the traffic stop.

¶ 30    Following arguments, the trial court found defendant guilty of the AHC count and stated "all other counts will merge." In finding defendant guilty, the court noted that he was the sole occupant of the vehicle, and the firearm was "readily accessible under the sweatshirt on the passenger seat." The court explained, "[I]f it were just that fact alone, my ruling would probably be different. However, defendant gives the police a fictitious identification card and why does he do that? Because he knows the gun is under that sweatshirt[.]" The court did not find defendant's

parole status relevant. The court acknowledged that there was no evidence of who the vehicle belonged to but concluded that the State "circumstantially proved in this case knowledge on the part of the defendant by his actions, fleeing, giving of the fake ID before fleeing and the positioning of the gun in car."

¶ 31    The court informed defendant again that he faced Class X sentencing, which carried a sentencing range of 6 to 30 years in prison. The court admonished defendant that he could request appointment of an attorney or hire one. Defendant stated that he wanted an attorney for sentencing, and the court appointed the office of the Public Defender.

¶ 32    In November 2019, defendant stated that he wanted to remain *pro se* to file his posttrial "motion to reconsider verdict." The court admonished him about his right to counsel and the potential penalties associated with Class X offenses that he faced. The court stated, "Defendant is admonished again pursuant to Rule 401. *** [T]he court reporter is directed to type up the transcript proceeding." It informed defendant's public defender he was not appointed "yet" and defendant then filed his *pro se* "motion to reconsider verdict."

¶ 33    In December 2019, defendant filed an amended *pro se* motion for a new trial. The court asked whether defendant wanted an attorney to argue his motions or file another motion on his behalf. Defendant asked whether the lawyer would "ultimately have the choice to deny [his motions] if he wanted to." The court stated that his lawyer "could decide they wanted to argue something different and file another [motion]" or could adopt his and add to it. When the court asked if defendant wanted a lawyer appointed, defendant replied, "At this time, I don't believe so." Defendant informed the court that he wished to represent himself to argue his posttrial motions. The court again admonished him about his right to counsel and the possible penalties he faced and

granted his request for a recess to discuss with his mother whether he wanted counsel. Defendant then elected to have an attorney represent him to argue his motions.

¶ 34    At a status hearing in February 2020, defendant's appointed counsel informed the court that defendant wished to proceed *pro se*. The court admonished defendant about his right to counsel, the potential penalties, and the risks associated with representing himself. The court stated, "Let the record show that defendant has been admonished pursuant to Supreme Court Rule 401 and the court reporter's [*sic*] directed to type up the transcript of these proceedings and place it in the court file." Shortly thereafter, he filed a motion to dismiss and a "motion for new trial dismissal."[3]

¶ 35    At an August 2020, hearing, defendant acknowledged that the court admonished him regarding his right to counsel, the possible sentences he faced, and that an attorney would be appointed for him if he could not afford one. Defendant confirmed that he still wished to represent himself "for the motion." He extensively argued his posttrial motions, including that the evidence failed to show he knew of the firearm in the vehicle, and therefore, the evidence failed to establish he constructively possessed it. He also disputed that Graal was the officer who recovered the firearm. The trial court denied the motion for a new trial, finding defendant made general allegations and "this fixation" on which officer first picked up the sweatshirt was irrelevant.

¶ 36    In January 2021, private counsel appeared on behalf of defendant and filed two motions supplementing defendant's posttrial motions to reconsider and for a new trial.[4] In relevant part,

---

[3] Defendant's motion to dismiss is not included in the record on appeal.

[4] These motions are not included in the record on appeal. It is generally the appellant's burden to properly complete the record on appeal. *People v. Henderson*, 2011 IL App (1st) 090923, ¶ 45. Any doubts arising from the incompleteness of the record will be construed against the appellant and in favor of the judgment rendered in the lower court. *Id.*

counsel argued that although defendant "did express his desire to represent himself," defendant should not have been permitted to proceed *pro se* in light of the seriousness of the offense, the complexity of the legal issues involved, and defendant's level of education. Counsel argued that an attorney could have investigated "certain things" and "[o]ther motions likely would have been filed" as to misconduct on the part of the testifying officers. Further, counsel argued that the evidence was insufficient to show defendant had knowledge of the firearm recovered from the vehicle. The State argued that defendant's waiver was knowing and voluntary, he was still proceeding *pro se* on the criminal case pending in Markham, and he received Rule 401 admonishments in that case as well. The State argued it proved defendant's constructive possession of the firearm, that he knew it was present and exercised immediate control over it.

¶ 37    The court denied defendant's posttrial motions, finding, in pertinent part, that "taking all the facts of this case, it is a reasonable inference that the defendant knew [the gun] was there *** and clearly had the ability to control it, and clearly I think he had the intention to control it. He knew that and he knew the police knew it and that's *** why he ran." The court acknowledged the difficulties defendant faced in proceeding *pro se* but he stated that he wanted to represent himself, knew what he was doing, and "he has got to live with the consequences of him representing himself." The court further stated not only did it admonish defendant under Rule 401 but it went "much beyond" Rule 401 in admonishing defendant before allowing him to represent himself.

¶ 38 On June 21, 2021, following a hearing at which defendant was represented by counsel, the court sentenced defendant to seven years in prison for the AHC count.[5] On the same date, defendant filed a timely notice of appeal.[6]

¶ 39 On appeal, defendant first challenges his AHC conviction, arguing that the State failed to prove beyond a reasonable doubt that he knowingly possessed the firearm recovered underneath a sweatshirt on the front passenger seat of the vehicle he was driving but did not own.

¶ 40 On a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) That standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the trier of fact on issues that involve the credibility of the witnesses and the weight of the evidence. *People v. Jackson*, 2020 IL 124112, ¶ 64. Circumstantial evidence alone is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged. *Id.* We draw all reasonable inferences in favor of the State, and we do not retry the defendant. *Id.*

¶ 41 To prove defendant guilty of AHC as charged, the State had to establish he knowingly possessed a firearm when he had previously been convicted two or more times of certain enumerated felonies. See 720 ILCS 5/24-1.7(a) (West 2016). Defendant does not dispute the State

---

[5] A different trial judge presided over sentencing.
[6] Defendant's notice of appeal listed an incorrect judgment date of November 22, 2019. We allowed defendant's request to amend the notice of appeal to reflect the correct date of judgment.

established his qualifying convictions barring him from possessing a firearm. He only contests the evidence supporting his constructive possession of a firearm.

¶ 42 A defendant's possession of contraband is a factual issue, and we will not disturb the findings of the trial court unless the evidence is so unbelievable that it creates a reasonable doubt as to the defendant's guilt. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. "Possession of contraband may be actual or constructive." *People v. Hill*, 2012 IL App (1st) 102028, ¶ 40. Where, as in this case, the contraband is not found on the defendant's person and he was not seen attempting to hide or discard the contraband, the State must prove constructive possession. *People v. Wise*, 2021 IL 125392, ¶ 24.

¶ 43 "To establish constructive possession, the State must prove beyond a reasonable doubt that a defendant (1) knew a firearm was present; and (2) exercised immediate and exclusive control over the area where the firearm was found." *People v. Sams*, 2013 IL App (1st) 121431, ¶ 10. "The trier of fact may rely upon reasonable inferences of possession and knowledge." *People v. Wright*, 2013 IL App (1st) 111803, ¶ 25. Constructive possession is typically proved entirely through circumstantial evidence. *People v. Smith*, 2015 IL App (1st) 132176, ¶ 26. Control is established by showing the defendant's intent and capability to exercise dominion over the area where contraband was found. *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27.

¶ 44 A defendant's knowledge of contraband may be inferred where it is found in an area under his control. *People v. Bogan*, 2017 IL App (3d) 150156, ¶ 29. Because the State could not rely on an inference of knowledge stemming merely from defendant's presence in the vehicle, the State had to present other evidence establishing defendant's knowledge of the firearm. See *People v. Hampton,* 358 Ill. App. 3d 1029, 1033 (2005). "Knowledge may be shown by evidence of a

defendant's acts, declarations, or conduct from which it can be inferred that he knew the contraband existed in the place where it was found." *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Knowledge may also be demonstrated by his statements or conduct upon encountering the police. *People v. Thomas*, 2019 IL App (1st) 162791, ¶ 27.

¶ 45     Taking the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found defendant constructively possessed the firearm. The evidence showed that police officers conducted a routine traffic stop on the vehicle defendant was driving. During the stop, defendant gave the officers an identification card bearing a different name than his own. When he could not produce a driver's license and was prompted to exit the vehicle, defendant instead fled, speeding away in the vehicle. Shortly thereafter, defendant exited and abandoned the moving vehicle and continued to flee, on foot. A search of the vehicle defendant abandoned revealed a firearm on the front passenger seat underneath a sweatshirt.

¶ 46     With respect to the control element, the circumstantial evidence showed defendant's intent and capability to exercise dominion over the area where the contraband firearm was found. See *Jackson*, 2019 IL App (1st) 161745, ¶ 27. "[D]irect evidence of a defendant driving a vehicle is surely sufficient evidence of control." *Bogan*, 2017 IL App (3d) 150156, ¶ 42. Here defendant was the sole occupant and driver of the vehicle, demonstrating he had control over the area where the firearm was recovered. *Id.* Crucially, the firearm was immediately accessible to him and within his reach where it was on top of the passenger seat next to him underneath only a sweatshirt. See *People v. McNeely*, 99 Ill. App. 3d 1021, 1023-24 (1985) ("because the defendant was the driver of the vehicle, and because he had merely a lone passenger, defendant had immediate and exclusive control of the inside of the automobile" for purposes of constructive possession of contraband

recovered from under the front passenger seat). Where the firearm was within arms reach of defendant, the only occupant to the vehicle, easily accessible under the sweatshirt, the trier of fact could reasonably infer the firearm was in defendant's immediate and exclusive control. See *People v. Grant*, 339 Ill. App. 3d 792, 799 (2003) ("Because of the location of the gun at the time it was recovered, we can certainly infer that defendant had knowledge of the gun and that the gun was within his immediate and exclusive control").

¶ 47    Defendant argues the State failed to prove his regular, ongoing control over or ownership of the vehicle. The State did not have to prove this. Where defendant was the driver and sole occupant of the vehicle at the time of the traffic stop, this was sufficient evidence to demonstrate that he had control over the area where the firearm was recovered. See *Bogan*, 2017 IL App (3d) 150156, ¶ 42 ("direct evidence of a defendant driving a vehicle is surely sufficient evidence of control"). The fact that defendant was not the owner of the vehicle does not negate his control over the area where the contraband firearm was found, immediately next to him. See *People v. Chavez*, 327 Ill App. 3d 18, 26 (2001) (the relevant consideration is control of the vehicle rather than ownership as to the narcotics found inside a vehicle).

¶ 48    The circumstantial evidence also showed defendant had knowledge of the firearm. Defendant's proximity to the firearm, which, as the trial court noted was "readily accessible" and covered by only a sweatshirt, and his conduct upon encountering the police support the inference that he had knowledge of the firearm. The evidence showed defendant fled in the vehicle when police asked him to exit it and disregarded two traffic devices while the officers pursued him. Eventually, defendant jumped out of the moving vehicle and abandoned it on a grassy median and then fled on foot to continue evading the officers. He stopped only when Officer Loeza caught up

to him and was able to detain him. Defendant's flight from the scene in the vehicle and shortly thereafter on foot are circumstances from which the trier of fact could infer his consciousness of guilt. See *People v. Hart,* 214 Ill. 2d 490, 518-19 (2005).

¶ 49    In addition, prior to fleeing, defendant gave a false identification to the officer, another circumstance supporting a reasonable inference of defendant's consciousness of guilt. See *People v. Harris,* 225 Ill. 2d 1, 23 (2007) (evidence of use of a fictitious name is a circumstance from which the trier of fact could infer consciousness of guilt). Defendant's actions support the court's inference that he had knowledge of the firearm in the seat next to him in the vehicle. See *Thomas*, 2019 IL App (1st) 162791, ¶ 27 (knowledge may be inferred from the defendant's actions and conduct). Taken together and viewed in the light most favorable to the State as we must, we do not find that this evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27.

¶ 50    We are unpersuaded by defendant's reliance on *People v. Bailey*, 333 Ill. App. 3d 888 (2002). In *Bailey*, the defendant was sitting in the front passenger seat of a vehicle being driven by another individual. *Id.* at 889. Police stopped the vehicle and, after seeing an open container of alcohol, ordered the occupants out. *Id.* at 890. Following an inventory search, the police recovered a firearm from under the front passenger seat of the vehicle. *Id.* The firearm was not visible until police looked under the seat. *Id.* The defendant was convicted of aggravated unlawful use of a weapon. *Id.* On appeal, the *Bailey* court reversed, finding that there was not "any affirmative evidence, either circumstantial or direct," to establish that the defendant had knowledge of the firearm. *Id.* at 892. The court found no evidence showing the defendant had knowledge of the weapon where it was under the seat and not visible, the defendant did not own the vehicle, police

did not see the defendant make gestures indicating he was trying to retrieve the firearm, and there was no connection between the owners of the vehicle and firearm and the defendant. *Id.*

¶ 51    We find *Bailey* distinguishable. While defendant is correct that his mere presence in the vehicle, without more, is not evidence that he had knowledge of the firearm (*id.* at 891), as previously detailed the circumstantial evidence here was sufficient to establish his constructive possession of the firearm. Unlike the defendant in *Bailey*, who was a passenger in the vehicle with another person, defendant here was driving the vehicle and the sole occupant. Although the firearm in this case was obscured by a sweatshirt, it was on top the passenger seat and readily accessible and within defendant's reach rather than underneath the seat as in *Bailey*. Critically, unlike the defendant in *Bailey*, defendant exhibited consciousness of guilt, presenting an identification card with a fictitious name and fleeing from police, first in the vehicle and then on foot.

¶ 52    We also reject defendant's contention that the State failed to prove he possessed the firearm where it did not provide evidence linking him to the firearm. He contends there was no evidence of his fingerprints or DNA on the firearm, he did not make any statements indicating he knew of the firearm, there was no proof the sweatshirt belonged to him, and the officers did not testify that they observed either the firearm itself or defendant making furtive movements suggesting he knew of its presence. However, as previously noted, circumstantial evidence alone is sufficient to sustain a conviction. *Pollock,* 202 Ill. 2d at 217. "Physical evidence linking defendant with the firearm is not required to establish that he committed the offense." *People v. Bobo*, 2020 IL App (1st) 182628, ¶ 43. As the trial court noted, if the evidence merely showed defendant in the vehicle with the firearm, its ruling would have been different. However, the evidence that the firearm was readily accessible to defendant and that defendant gave police a fictitious identification card and

fled, taken with his being the sole occupant of the vehicle, supported a reasonable inference that defendant knew the firearm was on the seat next to him.

¶ 53    Next, defendant argues that the trial court erred by allowing him to proceed *pro se* because his waiver of counsel was not unequivocal, and the court failed to ensure he understood the rights he was waiving and to ensure his waiver of counsel was knowing and voluntary.

¶ 54    As an initial matter, the parties disagree about whether defendant preserved this issue for review. To preserve an issue for review, both a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial. *People v. Williams*, 2022 IL 126918, ¶ 48. We agree with the State that defendant failed to preserve his claim where he failed to object the trial court's efforts to ensure his waiver of counsel was knowing and voluntary. However, as requested in defendant's reply brief, we review the claim under the second prong of the plain error doctrine. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) (raising plain error argument in reply brief is sufficient to enable appellate review of issue for plain error).

¶ 55    The plain error doctrine allows for the review of a forfeited issue where (1) the evidence was closely balanced; or (2) the error was so substantial that it deprived defendant of a fair trial. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 108 (citing *People v. Herron*, 2015 Ill. 2d 167, 178-79 (2005)). To prevail under either prong, defendant bears the burden of proving actual error. *People v. Mudd*, 2022 IL 126830, ¶ 22. Without an error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18. Thus, the first step in a plain-error analysis is to determine if a clear or obvious error occurred. *People v. Reese*, 2017 IL 120011, ¶ 60. Here, we find no error.

¶ 56    The right to counsel is protected by both the U.S. and Illinois constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; *People v. Wright*, 2017 IL 119561, ¶ 38. Illinois courts have

also recognized that a defendant's right to self-representation is as basic and fundamental as the right to be represented by counsel. *Id.* ¶ 39. A waiver of counsel must be clear and unequivocal. *People v. Mayo*, 198 Ill. 2d 530, 538 (2002). This is to "(1) prevent the defendant from appealing the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se." Id.*

¶ 57    Defendant first argues the overall context of the record shows his request to represent himself was equivocal. Specifically, he contends that his statements "I want another lawyer if I can, but if not, I will have to go *pro se*" and "I just want to go *pro se* so I can receive my discovery and see if I can get to trial" demonstrate that he vacillated in his request to proceed *pro se*. Therefore, defendant maintains, his request to proceed *pro se* was not clear and unequivocal. We disagree.

¶ 58    Defendant's contention that his waiver of counsel was equivocal is rebutted by the record. The record shows that defendant requested to proceed *pro se* in 2017 and, after receiving Rule 401 admonishments, hired private counsel. The following year, after private counsel withdrew from the case, defendant stated he wanted another lawyer, but if could not get one, he "will have to go *pro se*." Defendant informed the court he was representing himself in another criminal matter, declined the court's offer to hire other counsel, and stated, "I would just like to go *pro se* so I can receive my discovery and see if I can get to trial." The court again gave defendant extensive Rule 401 admonishments. Following the admonishments, defendant requested a continuance to think about whether he wanted to represent himself and to see if he could obtain new representation. The

court granted defendant a continuance. At the next court date, defendant informed the court he would represent himself and confirmed that he had received two admonishments about his rights.

¶ 59 That defendant wished to proceed *pro se* only if he could not obtain a new lawyer does not render his request equivocal. To the contrary, "a request for self-representation is not unclear or equivocal merely because it was a fallback to the defendant's first but unavailable choice of private counsel." *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 67 (collecting federal cases stating that a request to proceed *pro se* is not equivocal simply because it represents an alternative position). The record overall demonstrates that defendant's requests to represent himself were unambiguous and well-thought out. This conclusion is further supported by defendant's conduct after trial. Defendant was appointed a public defender following trial for assistance with his posttrial motions, and strategically requested again to represent himself so that he could advance his own *pro se* motions and arguments before the court. At defendant's request, the court removed the public defender as counsel. After defendant's motions were denied, he again hired private counsel, who represented him for additional posttrial motions and sentencing. Thus, the record shows defendant was unequivocal when seeking to represent himself and carefully selected the proceedings in which he desired counsel.

¶ 60 We are similarly unpersuaded by defendant's contention that the court failed to ensure he understood the rights he was waiving and that his waiver of counsel was knowing and voluntary.

¶ 61 Illinois Supreme Court Rule 401 (eff. July 1, 1984) sets forth the procedure for the waiver of counsel. It provides that the trial court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first addressing defendant in open court and informing him of and determining that he understands the following: (1) the nature of the

charge; (2) the minimum and maximum sentence prescribed by law, including penalties the individual faces due to prior convictions; and (3) that he has the right to counsel and, if he is indigent, to have counsel appointed for him by the court. Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 62    The purpose of Rule 401(a) is to ensure that a waiver of counsel is knowingly and intelligently made. *Reese*, 2017 IL 120011, ¶ 62; see also *Black*, 2011 IL App (5th) 080089, ¶ 11 (noting that "[t]he gravity of a waiver requires a trial court to fully inform a defendant of both the nature of the right being abandoned and the consequences of the decision"). "Each determination of whether there has been an intelligent waiver of the right to counsel depends on the particular facts and circumstances of the case, including the background, experience, and conduct of the accused." *People v. Redmond*, 2018 IL App (1st) 151188, ¶ 17.

¶ 63    Illinois courts have "declined to enforce a formalistic approach to the substantive requirements outlined" in Rule 401(a). *Black*, 2011 IL App (5th) 080089, ¶ 13. Rather, to constitute an effective waiver of counsel, substantial compliance with Rule 401(a) is sufficient if the record indicates that (1) the waiver was made knowingly and voluntarily and (2) the trial court's admonishment did not prejudice the defendant's rights. *Wright*, 2017 IL 119561, ¶ 41. We review whether a defendant's waiver of counsel was knowing and voluntary for an abuse of discretion and whether the court substantially complied with Rule 401(a) admonishment *de novo*. *Pike*, 2016 IL App (1st) 122626, ¶ 114.

¶ 64    While defendant does not assert that the court failed to give him proper admonishments, we note that the record shows that the court not only substantially complied with Rule 401(a) in admonishing defendant personally and in open court but also repeatedly ascertained that defendant understood his right to counsel, wanted to proceed *pro se*, and knowingly and voluntarily waived

it. The court ensured defendant understood the rights he was waiving and that his waiver was knowing and voluntary by giving him extensive explanations of his rights and explaining the consequences defendant faced if he proceeded without the benefit of counsel.

¶ 65    To that end, the trial court extensively admonished defendant regarding the nature of the charges, the possible penalties, his right to hire his own attorney or be represented by the office of the Public Defender if he could not afford an attorney, and the dangers of proceeding *pro se* without representation of counsel. The court specifically stated it did not recommend that defendant represent himself but that he had the right to do so. It then informed defendant that he would be held to the same standards as an attorney, would be required to follow court procedures, would not be able to change his mind once trial started, and could not complain of his own representation on appeal should he choose to proceed *pro se*. The court also described to defendant that his defense might be harmed if he represented himself and that his self-representation might lead to unintended consequences at trial. The trial court gave the series of admonishments in two hearings, in August 2017 and November 2018, each time defendant asked to proceed *pro se.* After each admonishment, the court asked defendant whether he understood. In August 2017, defendant asked clarifying questions and informed the court after each admonishment that he understood it. In November 2018, after each admonishment, the court asked whether defendant understood and defendant either asked for clarification or responded, "I believe so."

¶ 66    We grant that defendant asked follow-up questions for clarification of the court after certain admonishments. When defendant did not understand the AHC charge, he asked whether it constituted an offense or a sentence enhancement, and the trial court clarified that it was a charged offense. When defendant asked whether he could be represented by an attorney of his choice, the

court responded "yes," and stated defendant could hire "whoever [he] want[ed]" and that, if he could not afford counsel, the court would appoint one for him. These clarifications do not demonstrate defendant did not understand the admonishments. To the contrary, these instances demonstrate that his decision to waive his right to counsel was informed, thoughtful, and knowing. Defendant at no other time gave any indication that he did not understand the court's admonishments or the right he was giving up. At the end of the November 2018 hearing, he requested additional time to consider his options, which the trial court allowed. At the next court date in December 2018, defendant unequivocally told the court he was "going to be representing [himself]" and confirmed that the court previously had informed him of his "rights."

¶ 67    Importantly, a "practical and realistic reading of the entire record" (*People v. Nunn*, 29 Ill. App. 3d 399, 404 (1975)) reveals that defendant's conduct relating to his defense demonstrated his detailed knowledge of the legal proceedings. *People v. Jackson*, 59 Ill. App. 3d 1004, 1009 (1978) (stating that the defendant's "conduct of the defense demonstrated his intricate knowledge of court proceedings and his familiarity with court records"). During the admonishments, defendant informed the court he was representing himself in another criminal case in a different courthouse. He filed numerous *pro se* motions wherein he cited appropriate legal authority, and both argued and examined a witness at a pretrial motion to suppress hearing. Defendant further engaged in certain effective cross-examination of the officers, made arguments throughout the proceedings addressing constructive possession and his lack of knowledge of the firearm, and otherwise presented a comprehensible (albeit unsuccessful) defense. See *e.g.*, *People v. Simpson*, 172 Ill. 2d 117, 134 (1996); *People v. Maxey*, 2018 IL App (1st) 130698-B, ¶ 52. In light of the substantial evidence in the record that defendant unequivocally understood the right he was giving

up, we cannot say that his waiver of counsel was not knowing and voluntary. Thus, we do not find that the trial court erred in allowing him to proceed *pro se* following its substantial compliance with Rule 401(a).

¶ 68    Accordingly, because no error occurred, an analysis under the plain error doctrine is unwarranted. See *Hood*, 2016 IL 118581, ¶ 18 (without error, there is no plain error).

¶ 69    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 70    Affirmed.