2023 IL App (1st) 1210369-U

No. 1-21-0369

Second Division
March 7, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 19 CR 05294 (03) |
| v. | ) ) | |
| JOVAN BATTLE, | ) ) | Honorable Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment.[*]

**ORDER**

¶ 1     *Held*:  Defendant's convictions and sentence are affirmed where the trial court did not err in allowing defendant to represent himself at trial, there was sufficient evidence to

---

[*]Oral argument was held in this case via Zoom technology. Due to technical difficulties, Justice Ellis was unable to participate in the oral argument but has listened to a full recording of the argument, as well as reviewed the briefs and otherwise participated in the deliberations.

support his convictions, and the prosecutor's comments during closing argument and in rebuttal were not improper.

¶ 2    Following a jury trial, defendant-appellant Jovan Battle was found guilty by accountability of first degree murder, aggravated battery, and aggravated discharge of a firearm, and sentenced to an aggregate 65 years' imprisonment. On direct appeal, he argues that (1) the trial court erred in allowing him to proceed *pro se* because he did not knowingly and intelligently waive his right to counsel; (2) there was insufficient evidence to prove him guilty beyond a reasonable doubt of the charged offenses; and (3) the prosecutor's comments during closing argument and in rebuttal were improper. For the reasons that follow, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4    The charges against defendant, as well as codefendants Jaquan Washington and Menelik Jackson,[†] arose from a shooting that took place on March 23, 2019 near 715 North Clark Street in downtown Chicago, resulting in the death of John Rivera and serious injury to Ruben Sierra.

¶ 5    On April 24, 2019, defendant was charged by indictment with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)), three counts of attempt first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)), one count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2018)), and three counts of aggravated discharge of a weapon (720 ILCS 5/24-1.2(a)(2) (West 2018)). Later, the State nol-prossed the charges of attempt murder.

¶ 6                                  A. Pre-Trial Proceedings

¶ 7    As relevant to the issues on appeal, we provide excerpts of the report of proceedings.

¶ 8    On May 1, 2019, the following exchange took place before the court:

---

[1] Neither codefendant is a party to this appeal.

"THE COURT: Did you hire a lawyer on this, Mr. Battle?

DEFENDANT: I didn't hire a lawyer, sir. But I'll[*sic*] like to go *propria persona*, not *pro se*. I asked my lawyer – My attorney, I told him I would like to go *propria persona*, your Honor. He said, either I'm in or I'm out. *** I said, okay, well, I'll[*sic*] like to go *propria persona*, which means that he's my legal adviser—

THE COURT: Then you want to represent yourself?

DEFENDANT: Exactly. But he's also with me, your Honor, as I have legal eyes with me. He said he's in or he's out. So that means he doesn't want to be there. So I would like to go *propria persona*/*pro se* until you appoint me another one. So I'd like to go *propria persona*, sir.

THE COURT: What do you mean?

DEFENDANT: *Propria persona* means that you have a legal adviser with you. So I'm trying to go *propria persona*, I wasn't trying to go *pro se*.

THE COURT: We're not there yet. The question is, do you want to represent yourself?

DEFENDANT: Yes, sir. Yes, sir, [y]es, sir, your Honor."

¶ 9    The court then read the charges against defendant and informed defendant of the sentencing range for the charges. Defendant stated that he understood the charges and potential penalties.

¶ 10    The court informed defendant that he had the right to have an attorney represent him on the charges and that he could either hire his own attorney, have a public defender appointed to represent him, or he could represent himself. Defendant confirmed that he understood his options. The court stated that it could not recommend self-representation but it was an option available to

defendant. After some inquiry, the court learned that defendant was 32 years old, had reached his junior year of high school, and had represented himself on several civil cases in the past. Defendant then stated, "But I didn't say I wanted to go *pro se*. And I don't want to be forced into going *pro se*. I said I want to go *propria persona*." The court responded, "Oh, and you want to have somebody sitting over there with you?" Defendant responded that he did. The court stated that they would "get to that." The court explained, in detail, the benefits of counsel and the disadvantages of self-representation. The court informed defendant that if he proceeded *pro se*, he would not be able to complain on appeal about the competency of his representation. Finally, the court stated that defendant would not be able to change his mind regarding his representation once the trial began and that the court itself could not serve as defendant's lawyer.

¶ 11     The court then stated:

> "Now, I don't see any reason at this point to appoint standby counsel to represent you. So you are going to be sitting over there by yourself. I don't see anything about the case that I haven't been told. Although I don't know a great deal about the case, I don't know any reason that I will give a standby counsel. So it's a good bet that you are going to be over there by yourself. Do you understand?"

Defendant confirmed that he understood but again brought up his request to proceed *propria persona* because he felt that he needed an advocate. The court informed the public defender that if the court felt the need to appoint standby counsel, the public defender would have to offer that service but the court was not doing so at that time.

¶ 12     Again, the court asked defendant if he still wanted to represent himself. Defendant answered, "I understand, your Honor. For the record, I understand. I'll[*sic*] like to go *pro se*."

Subsequently, the court concluded that defendant understood the nature of the charges, his rights to an attorney, and the admonitions given to him.

¶ 13    At that time, the State informed the court of defendant's history of mental illness, and on that basis, the court granted the State's request for a behavioral clinical examination and delayed its ruling on defendant's waiver of counsel until the results were submitted.

¶ 14    On June 25, 2019, the final examination report was submitted to the court, which showed that defendant was fit to stand trial. The court once again conducted a colloquy regarding defendant's representation. The following exchange was had:

"THE COURT: Who do you want to represent you on this? Are you going to represent yourself or are you willing to keep your lawyer?

DEFENDANT: I'm representing myself.

THE COURT: You want to represent yourself?

DEFENDANT: Absolutely. I would like to go *pro per personam*. I'd like to have legal assistance. I'm acknowledging my [6th] Amendment right.

***

THE COURT: First of all, I have to tell you some things here before I let you do that. First of all I have to make sure you understand what you're charged with."

¶ 15    The court explained the charges against defendant and asked defendant if he understood what he was charged with. He indicated that he did not understand whether he was "being charged as the shooter of the case or accessory after the fact because there's no accessory to murder charge." The court responded that "[t]here's no such thing as accessory after the fact. You're being charged as a principal." Defendant stated that he understood all of the charges.

¶ 16    The court reviewed the penalties for defendant's charges and confirmed that the sentencing range, if convicted of all charges, would be between 77 and 165 years in prison. The court asked if defendant understood the possible penalties. The following exchange then occurred:

"DEFENDANT: I understand some of it. The only thing I don't understand is why I'm charged with aggravated discharge of a firearm. I never discharged a firearm.

THE COURT: That's because they're charging you on a theory of accountability.

DEFENDANT: Theory of accountability.

THE COURT: Yes. They're charging you with that because you're responsible for the acts of your co-defendants that were committed in the course of the crime. That's what they're saying. So you understand the possible sentences?

DEFENDANT: I do. I mean, I understand somewhat because I also have—

THE COURT: Wait a minute, wait a minute.

DEFENDANT: For the record, for the record, Your Honor, accountability accessory 720 ILCS—

THE COURT: We're not talking about accountability now. We're just talking about this is what the minimum and the maximums are. Do you understand that?

DEFENDANT: Yes, sir.

THE COURT: Now, do you understand you have a right to have an attorney represent you on these charges? Do you understand that?

DEFENDANT: Somewhat because I also have the right to 6th Amendment to have assisted counsel on the side of me which is *pro per persona*.

THE COURT: No, you don't.

DEFENDANT: Yes, I do, Your Honor. I'm not going to argue with you, but yes, I do, Your Honor.

THE COURT: I'm not going to argue with you either. I'm just telling you what your rights are."

¶ 17 For the second time, the court explained to defendant his options for representation, including his right to an appointed public defender, and defendant confirmed that he understood. The court explained the advantages of having a lawyer represent him and the disadvantages of representing himself. Defendant indicated that he understood. The court then stated, "I'm not going to appoint a lawyer to sit there with you. This is a fairly simple case it appears to be, so you're going to be over there by yourself; do you understand that?" Again, defendant indicated that the constitution gives him the right assistance of counsel but he then stated, "But if you choose that and that's under your will, sir, I'll go with you, I'll go pro per then. I have to do what you say. I understand." The court responded that it did not see any need for standby counsel and, thus, standby counsel would not be appointed. The court then asked defendant, "After everything I told you do you still want to represent yourself?" Defendant responded, "Absolutely. I would like to fire this man." The court informed defendant that it did not consider it to be a smart idea to represent himself but he would allow defendant to do so. Defendant confirmed once again that he wanted to represent himself. The court ultimately found defendant was properly admonished regarding waiver of counsel pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) and allowed the public defender leave to withdraw.

¶ 18 On July 15, 2019, defendant inquired about subpoenaing witnesses, and the following exchange occurred regarding his motion for subpoenas:

"DEFENDANT: Now, my indictment—this is my indictment. They are charging me with, like I said, aggravated discharge of a firearm and aggravated battery. So to commit an aggravated battery. I obviously have to have a gun in my hand and shoot somebody.

THE COURT: You could be accountable.

DEFENDANT: Okay. Could be accountable. I got something else I want to talk about accountability too. I got a statute about accountability that says you are not—whatever. It doesn't make a difference right now because I am not going to try to keep arguing with these people because they robots. *** I want to subpoena [Sierra] to see who—so he can say who shot at him because I have that right to face my accuser.

THE COURT: When you get to trial, you can do that.

DEFENDANT: Okay. I shouldn't be held under a charge if nobody bring said victim in court. I haven't heard the victim in court at all.

THE COURT: They are saying you are responsible, that you are criminally responsible.

DEFENDANT: Now I am criminally responsible.

THE COURT: That's what they are saying.

DEFENDANT: Okay. All right.

***

DEFENDANT: I am not scared at all. I fear you guys none because I know for a factor[*sic*] what you are saying is accountability, and I understand that, your honor.

I am not angry at you at all. What I am angry at is the factor[*sic*] that they keep coming off the same, accountability, accountability, accountability."

¶ 19    Later, while discussing defendant's bond, defendant stated: "So all I am asking for is that you kind of shade your eyes to the fact of this mayhem that they are talking about because most of the mayhem they are talking about—I understand that—the fact I was so-called present or so-called whatever accountability factor, but what I am saying is if you can at least, by the graces, kind of not look at the factor[*sic*] of that."

¶ 20    The court also appointed "a public defender as standby counsel for the sole purpose of playing these tapes for you over in the jail."

¶ 21    On that same day, defendant made another request for assisted counsel when the trial begins and that he wanted to proceed "*pro per persona*." The court stated that it had already informed defendant that it was not going to appoint counsel to sit with him during trial. The court further stated, "If you want to represent yourself, represent yourself." Defendant responded, "I want to represent myself *pro per persona*, but you forced me to go *pro se*. I asked to be *pro per persona*, which means assistance of counsel. What you are saying is you are not going to let me." The court responded that it had already ruled on that request and defendant could include that issue in his appeal.

¶ 22    On August 1, 2019, defendant filed a motion *in limine*, arguing that he had not been charged as an accessory to murder. The court responded, "You're charged with murder on the theory of accountability. We don't have accessory to murder in the state of Illinois." The court then confirmed once again for defendant that he was charged under a theory of accountability.

¶ 23    On August 7, 2019, another similar discussion occurred regarding defendant's assertion that he did not shoot anyone and he did not have a firearm in his hand.

"DEFENDANT: You can't charge me—You can't charge me on accountability. If the gun is in somebody else's hand, how am I accountable for that?

THE COURT: They can charge you. Now, whether they can prove it or not, that's different. But they can charge you."

¶ 24                                   B. Trial

¶ 25    Defendant's jury trial was held from August 13 to August 16, 2019.

¶ 26    Based on the testimony of Kiara LaPointe and Alison Strange, the following events occurred on the evening of March 22 into March 23, 2019, prior to the shooting.

¶ 27    On March 22, LaPointe, Strange, and Melissa Williams, three friends, traveled to Chicago to attend a concert at the House of Blues in downtown Chicago. They had booked a room at Hotel Felix, which was a short walk from the concert venue. At the concert, the women met two men, codefendants Washington and Jackson. Jackson was wearing jeans and a green jacket with patches on it and Washington was wearing jeans, a black hooded sweatshirt, a hat, and a fanny pack. After the concert, the three women and the two men walked to the Hotel Felix. Near the hotel, the group stopped and the men offered the women a marijuana cigarette, which they all smoked. They then retrieved Jackson's white pickup truck from a nearby parking garage, drove to Jackson's home and then to the liquor store. At some point, the men showed the women a BB gun that they had in the truck. The group returned to Hotel Felix. Upon entering the hotel, LaPointe and Strange noticed a man, who they each identified as defendant, with security guards in the lobby. No words were exchanged and they did not know what defendant was doing there. In their hotel room, the group talked and drank alcohol. At some point, LaPointe and Strange left with codefendants to walk to the McDonald's, located at 660 North Clark Street.

¶ 28    At McDonald's, a security guard stopped Washington because he had a glass of alcohol. Washington stayed outside while the women ordered food. After getting their food, Strange noticed a "commotion" outside. The women saw Washington "getting beat up" by two or three Hispanic men and Jackson running in the direction of his truck.

¶ 29    Security footage from the McDonald's, which depicted the events and altercation described by the women, was shown to the jury through the testimony of Frank Mejia, director of security personnel. The footage showed, just prior to the altercation, a number of individuals talking outside the McDonald's and two other individuals, identified as codefendants, join the group. The two men shook hands and hugged the other men, until one individual punched Washington several times. There was a brief "scuffle" among the people congregated outside until security guards began approaching the group. The two men ran away, and Mejia commented that one of them appeared to be gripping something on the side of his waist. Mejia confirmed that defendant was not shown on any of the footage.

¶ 30    Strange and LaPointe walked directly back to their hotel. Jackson approached them as they were walking back. Strange was under the impression that Jackson had a gun in his waistband. She told him "not to be stupid." Jackson and Washington arrived at the women's hotel room about five minutes later. The women both observed a cut or gash on Washington's nose. Washington explained that the men wanted him to throw a gang sign and he refused, which is why they hit him, and Jackson commented that he should have had his gun on him and protected Washington. He also stated that he wanted to kill the two Hispanic men. Jackson was agitated and yelling that he and Washington needed to handle this. Upon inquiry from one of the women, Jackson admitted that he had a gun on him. LaPointe observed Jackson take a gun from his waistband and lay it on the counter in the room. Around 3:30 a.m., the women told the men to leave the hotel room. Shortly

after leaving, the men returned to look for a missing extended magazine clip, which they could not find. About 5 or 6 minutes after the men left the hotel room, Strange heard six to eight back-to-back gunshots. LaPointe testified to hearing approximately six rapid gunshots. From their hotel window, they could see police arriving at the scene. The women drove home the following morning.

¶ 31    On cross-examination, both women confirmed that they did not see defendant with the codefendants at any point that night, only briefly in the hotel lobby.

¶ 32    Meanwhile, according to Jack Hightower, Sierra, and Sara Garcia's testimony, the following occurred that evening.

¶ 33    On March 22, 2019, Hightower, a Chicago police officer, ended his shift at 10 p.m. He picked up his friend, Sierra, and they drove to Rivera's home, where they all got in Rivera's black Honda Accord. Rivera was also a Chicago police officer. Both Hightower and Rivera were off duty at that point. Rivera drove them to Headquarters, a bar in downtown Chicago, arriving around 11:30 p.m. Later, Garcia, Rivera's girlfriend, met them outside of Headquarters. All four left and walked to Rivera's car. From there, they decided to go to Stout Bar, which is located near the intersection of Clark Street and Huron Street. Rivera parked near that intersection and they walked to the bar, arriving between 12:30 and 1 a.m. They left Stout around 3 a.m. and walked back to Rivera's car.

¶ 34    As they were walking towards the car, Hightower observed a man wearing a red hooded sweatshirt standing in a doorway on Clark. No words were exchanged but he made eye contact with the man. A surveillance video was introduced into evidence, which showed the group on Clark walking towards the car. The group got in the car, with Rivera in the driver's seat, Sara in the front passenger's seat, and Hightower and Sierra in the back seat. Hightower testified that at

this point Rivera turned around and asked Hightower if he had his weapon on him, which he did not.

¶ 35    Hightower noticed two men approaching the vehicle. One man wearing a red hooded sweatshirt stood in front of the vehicle and the other man wearing a beige jacket approached the driver's side door. Hightower identified the man in front of the car as the man he had seen in the doorway. He testified that defendant was pointing something in his hand towards the vehicle. Hightower testified that Sierra's window was slightly open and he heard someone say "Blow that b***." He could not identify which man made that statement. The man standing outside Rivera's door then began shooting into the vehicle, at which point Rivera reached over to cover Sara. Hightower testified that multiple shots were fired into the driver's door and the rear door and that the entire incident lasted between 15 and 20 seconds. The man in front of the car ran southbound on Clark and the other man ran eastbound on Huron. Hightower stepped out of the vehicle and called 911. He attempted to render aid to Rivera who had been shot. Sierra had also been shot. Hightower and Sara were unharmed. On cross-examination, Hightower confirmed that he did not see defendant fire any shots at the vehicle. Hightower's 911 call was played for the jury, and he confirmed that at first he stated that there was only one perpetrator but then corrected himself and stated that there were two.

¶ 36    According to Garcia, after getting into the front passenger seat of Rivera's car, she heard Hightower say something to Rivera but did not know what. Soon after, several gunshots were fired at the vehicle. Garcia testified that she was not injured in the shooting. On cross-examination, she stated that she did not know whether defendant was the shooter.

¶ 37    According to Sierra, after they all entered the vehicle, two men approached and opened fire on the vehicle. The shots came from the driver's side of the vehicle. After the shooting, Sierra

exited the vehicle, called his brother, and at that point, realized he had been shot. He was taken to the hospital, where he had surgery on his throat. He was also shot in both arms. On cross-examination, Sierra testified that he was not sure whether defendant shot at them.

¶ 38    Adilet Salmakeev testified that on March 23, 2019, around 3:30 a.m., he was in his vehicle at the intersection of Clark and Huron when he observed two men hurriedly cross Clark in front of him. He described one man as wearing a red hooded sweatshirt and the other wearing a dark cap and a jacket. He observed the men approach a parked car and the man in red say something but he could not hear him. The man in red stood in front of the vehicle and gestured with a bottle towards the vehicle. The other man stood on the driver's side. After they spoke for about eight to ten seconds, the man on the driver's side began shooting. The man in red ran away and the other man walked towards a white truck. Salmakeev then called 911. On cross-examination, Salmakeev confirmed that he did not see the faces of the two men. He was not able to identify the man in red as defendant but confirmed that the man in red did not shoot at the vehicle.

¶ 39    Chicago police officer Michael Mickey testified that, on March 23, 2019, he was assigned to the Strategic Decisions Support Center, and, around 3 a.m., he received a call that an officer needed assistance. He testified that there was a police pod camera (Pod Number 6774) located at the intersection of Clark and Huron Streets and he located the surveillance feed from that pod camera and relayed what the footage showed to fellow officers in the area. The pod camera footage was published to the jury with Officer Mickey's narrative. The video showed two black men, one wearing red and black (identified as defendant) and the other wearing a green jacket (identified as Jackson), approach a car parked on Clark. As they walked towards the car, defendant looks over both shoulders and then points a bottle at the car multiple times. As Jackson pulled out a gun and fired multiple shots at the car, defendant, whose arm was extended towards the car, began slowly

backing away. He did not know at the time which individual was the shooter. Right after the shooting, Jackson ran down Clark. Defendant walked away down Huron and dropped an object next to a flower planter. On cross-examination, defendant asked how Officer Mickey knew that defendant had committed a crime, and Office Mickey responded, "Because you were with [Jackson] the whole time. And as he was shooting, you were standing there watching him. And instead of rendering aid and helping [the victim], you ran off." When defendant asked, "Did I shoot at all when I was standing in front of the car?", Mickey responded "No, but you pointed out who was going to be shot."

¶ 40 Doctor Lauren Woertz, an assistant medical examiner, performed an autopsy on Rivera. Her examination revealed three gunshot wounds to Rivera's body, including one to the left side of his chin and two to his back. She recovered two bullets from his body. It was her opinion, to a reasonable degree of medical certainty, that the cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 41 Chicago police officer Michael Mockovak testified that he participated in the arrest of defendant on March 23, 2019. He had received a report of a shooting at 715 North Clark at 3:26 a.m., and he stopped defendant about 15 minutes later at 111 West Erie Street based on the description of a black male wearing a red hooded sweatshirt and black jacket. He was located within about a block of the shooting. During his arrest, defendant stated that he had nothing to do with the shooting and he was blocks away at the time the shots were fired.

¶ 42 Defendant was transported to the police station. Chicago police detectives Robert Graves and Marc Lapudola interviewed defendant around noon on March 23, 2019. Portions of the recorded interview were shown to the jury, which depicted the following. Defendant stated that he was walking on Huron and he saw a white pickup truck parked across the street and Washington

and Jackson were in the truck. Defendant informed the detectives that he did not know Washington and Jackson but he had seen them around the area in the past. He stated that he knew that they had been "jumped on" recently by the group in Rivera's car, but he did not see the earlier altercation. He informed the detectives that the group, three guys, one of which he identified as Mexican, and a girl, had walked by him previously on their way to their car on Clark. The two men exited the truck, and defendant stated that he "thought they were coming to shoot [him]." Instead, the men asked, "Is that them? Is that them?" He stated to detectives, "I'm not gonna let a group of people fight 4 on 2. So I thought we were gonna fight." Defendant offered to assist the two men, and he admitted that he had a bottle in his hands. Washington and Jackson asked "where did they go" and "what car did they go in" and defendant pointed the bottle at the car. He stated that he "did not know what [Jackson] had on him" and he did not know that Jackson had a gun. He also heard someone other than Jackson say, "blow that s*** down." Defendant admitted that he was a Gangster Disciple. When asked why he helped these two random men, he explained that there is a code for Gangster Disciples "to help a fellow brother out" and he knew that Jackson and Washington were Gangster Disciples because they said "folk." He stated that he asked if they needed help because he was not going to let "f*** Mexicans jump on a f*** black person."

¶ 43    The investigation resulted in the recovery of Jackson's white truck and Jackson was arrested soon thereafter. A search warrant was obtained for Jackson's apartment. Chicago police officer Paul Carriere, an evidence technician, testified that on March 24, 2019, the warrant was executed and he recovered a bookbag that contained a .40 caliber handgun, a wallet containing Jackson's driver license, and an ammunition magazine. He also recovered a green jacket with patches on it, as well as a black skullcap.

¶ 44 According to Chicago police detective Arturo Mena, by March 31, 2019, based on conversations detectives had with LaPointe and Strange, they began looking for a third suspect, Washington. He turned himself in on April 2.

¶ 45 Notably, on cross-examination, defendant asked Detective Mena about the charges against him and Detective Mena confirmed that defendant was not armed when he was taken into custody but that he was not "charged with those charges because [he] had or didn't have a firearm. [He was] charged with that because of [his] actions that morning." Defendant then asked, "What actions was that?" Detective Mena responded, "Pointing at the vehicle, pointing in the direction of those innocent victims, pointing in their direction knowing that they were about to get hurt some way, somehow, that's why."

¶ 46 The following evidence was recovered near the scene of shooting. Multiple fired .40 caliber Smith and Wesson cartridge cases were recovered from the sidewalk and street. A bottle was recovered from 70 West Huron Street. Two fired bullets and one metal fragment were recovered from the victim's car, which had bullet holes in the windshield, front and rear driver's side windows and doors, and the interior.

¶ 47 A forensic scientist with the Illinois State Police determined that the eight cartridge cases were fired from the recovered firearm and one of the bullets recovered from Rivera's body was fired from the same recovered firearm. The findings as to the second bullet recovered from Rivera's body were inconclusive.

¶ 48 The State rested, and defendant made a motion for a direct verdict, which the trial court denied. Defendant rested.

¶ 49 Relevant here, during closing arguments, the State argued that defendant inserted himself into the situation with Jackson and Washington, that he spoke with them outside Jackson's truck,

and that he offered his assistance to them based on their association as Gangster Disciples. At one point, the prosecutor stated: "He inserted himself. And you've watched him all week. Does that surprise you? He approached Jackson and Washington and asked if they need him to assist."

¶ 50    Defendant presented a narrative of his life, claiming that he, too, is a "victim" and explaining that he had a difficult upbringing, that he was part Hispanic himself, and that he was previously a drug addict. Further, he asserted that his motions and his evidence were rejected because he is a "black man going *pro se*." He argued that he was an "asset to the community," stating that he has "stopped a lot of robberies" and "saved a lot of people's lives in those bar areas." He again referenced his self-representation, stating:

> "Because guess what, that man who says he is the law refused to give me assistance of counsel. It's called *propria persona*. Let's speak about the law for a second. *Propria persona* means I have assisted counsel next to me. I just go forward. So I would have somebody else with me."

¶ 51    In rebuttal, the State stated the following;

> "The fact that the defendant chose to represent himself, he told you he had an attorney. *** He has chosen to represent himself. You not use that for or against him. It's his choosing. You cannot let that fact influence your decision. *** I mean, because the defendant has acted as his own attorney, you've had a chance to watch this guy for a week. And you've seen his actions and mannerisms. You saw the videotape of his yelling and pointing, and you've seen him in court yelling and pointing. You saw him in jury instructions when he is asking you, what your what's your name, how do you know spell that, hey, play the video tape. That's what the defendant does when he wants to get something done. He yells, and he points. That's exactly what he was doing that night. He

- 18 -

armed himself with a bottle. He knew what type of confrontation he was getting into. \*\*\*

He also said he is an asset to society. Who is an asset to society? Is it John Rivera and Jack

Hightower who are police officers and protect us? Is it Ruben Sierra who served his country

in the military? Is it Sara Garcia helping patients out at a hospital?"

¶ 52    The jury found defendant guilty of first degree murder, aggravated battery, and aggravated

discharge of a firearm.

¶ 53                                          C. Post-Trial Proceedings

¶ 54    On the next court date, the court admonished defendant once again as to the nature of the

offenses, their penalties, and his rights regarding representation. During these discussions,

defendant claimed that he had a right to proceed *propria persona* and that he wanted an attorney

"from the get-go" but he did not want an "attorney to run the show." The court responded that

there was nothing unusual about the case and denied the request for standby counsel. Ultimately,

defendant requested to have a public defender appointed and the court did so for post-trial motions

and sentencing.

¶ 55    Defendant filed a motion for a new trial, in which he argued that he did not knowingly and

intelligently waive his right to counsel, the court should have appointed standby counsel, the State

made improper statements during opening and closing arguments, and the evidence was

insufficient to prove defendant guilty beyond a reasonable doubt. The motion was denied.

¶ 56    Following a sentencing hearing, defendant was sentenced to 35 years' imprisonment plus

a 15-year firearm enhancement for murder, a consecutive term of 10 years for aggravated battery,

and five years for aggravated discharge of a firearm, which ran concurrent to one another but

consecutive to the other sentences, for an aggregate 65 years' imprisonment. Defendant's motion

to reconsider was denied.

¶ 57    This appeal followed.

¶ 58                              II. ANALYSIS

¶ 59    On direct appeal, defendant claims that: (1) the trial court erred in allowing defendant to proceed *pro se* because he did not understand the nature of the charges and his request to represent himself was equivocal, (2) the State failed to prove defendant guilty beyond a reasonable doubt of the charged offenses, and (3) defendant was denied a fair trial due to the State's improper comments made during closing argument and in rebuttal.

¶ 60                          A. Right to Counsel

¶ 61    Defendant argues that the trial court erred in allowing him to proceed *pro se* for two reasons: (1) he did not understand the nature of the charges against him and (2) his request was equivocal where he requested standby counsel.

¶ 62    However, to preserve a claim of trial error, a defendant must object to the error at trial and include the error in a post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant concedes that he failed to preserve this claim. As such, he requests plain error review, which is an exception to the application of waiver.

¶ 63    Pursuant to Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), the plain error doctrine permits a reviewing court to address a forfeited claim where a "clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Hood*, 2016 IL 118581, ¶ 18. The defendant bears the burden of establishing plain error.

*People v. Wilmington*, 2013 IL 112938, ¶ 43. The first step, however, is to determine whether the trial court erred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 64    We first address defendant's assertion that he did not understand the nature of the charges. In particular, he argues that the trial court failed to comply with Rule 401 where it did not ensure that defendant understood that the charges against him were premised exclusively on a theory of accountability. He further contends that, throughout the proceedings, he expressed misapprehension of the charges against him and the court should have explained the theory of accountability to defendant.

¶ 65    The sixth amendment of the United States Constitution guarantees the right to assistance of counsel in a criminal proceeding. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996). However, a defendant may choose to proceed *pro se*. *People v. Baez*, 241 Ill. 2d 44, 115 (2011). To do so, a defendant must first voluntarily, knowingly, and intelligently waive his or her right to counsel. *Haynes*, 174 Ill. 2d at 235. To make such a determination, the court considers "the particular facts and circumstances of that case, including the background, experience, and conduct of the accused." *People v. Lego*, 168 Ill. 2d 561, 565 (1995).

¶ 66    Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) requires that the trial court ensure that the defendant wishing to waive counsel understands the nature of the charge, the minimum and maximum sentence prescribed by law, and his right to counsel. Without the proper admonishments in accordance with Rule 401(a), there can be no effective waiver of counsel. *People v. Langley*, 226 Ill. App. 3d 742, 749 (1992). Strict compliance with the rule is not necessarily required. *Haynes*, 174 Ill. 2d at 236. Substantial compliance with the rule is sufficient if the record indicates that the waiver was made knowingly and voluntarily and the admonishment received did not prejudice defendant's rights. *Id*. Whether a trial court's admonishments

substantially complied with Rule 401(a) depends on each case's particular facts. *People v. Wright*, 2017 IL 119561, ¶ 54.

¶ 67    The legal question of whether the trial court substantially complied with Rule 401(a) is reviewed *de novo*, whereas the trial court's ultimate decision on a defendant's election to proceed *pro se* is reviewed for abuse of discretion. *People v. Khan*, 2021 IL App (1st) 190679, ¶ 46. An abuse of discretion occurs only where the trial court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Baez*, 241 Ill. 2d at 106.

¶ 68    In this case, the record shows that the trial court did not err in its admonishments to defendant. The trial court informed defendant on at least two occasions, once prior to the fitness examination and once afterwards, of the charges against him, the range of penalties to which defendant could be sentenced, and defendant's right to hire counsel, to have counsel appointed for him, or to represent himself. The court explained the advantages of counsel and the disadvantages of self-representation and that it did not recommend defendant proceeding *pro se*. Accordingly, the record supports the conclusion that the trial court substantially complied with Rule 401(a) and properly accepted defendant's subsequent waiver of counsel.

¶ 69    Nonetheless, defendant specifically asserts that the court did not properly explain to him the legal theory of accountability and therefore he did not understand the nature of the charges against him as required by Rule 401(a).

¶ 70    Defendant argues that *People v. Peoples*, 2015 IL App (1st) 121717, supports his assertion that "it was unfair to require [him] to go to trial on a pure theory of accountability, when he did not understand that aspect of the charges." We disagree. *Peoples* does not support such an assertion. That case, as defendant explains, stands for the proposition that "it is improper to allow

a conviction based on accountability, where that theory was not pursued at trial." *Id.* ¶ 97. The issue in *Peoples* was that the trial court responded to a jury question indicating that accountability was a viable theory for the defendant's culpability, despite the State never raising that theory at any point and the defendant having no opportunity to present a defense. *Id.* ¶ 93. We fail to see how the holding of *Peoples* is applicable to defendant's claim that the trial court should not have accepted defendant's waiver of counsel. In any case, here, defendant was undoubtedly made aware that the State was pursuing the charges on a theory of accountability and the jury was instructed as to accountability.

¶ 71 Otherwise, defendant fails to cite to any case requiring this depth of explanation of the charges. Instead, the State in its responsive brief cites to a number of cases suggesting the opposite. For instance, in *People v. Pike*, 2016 IL App (1st) 122626, ¶ 117, this court held that "[t]he plain language of the rule does not require recitation of all pending counts." In coming to that conclusion, the *Pike* court cited to *People v. Harden*, 78 Ill. App. 2d 431, 444 (1966), which held that the language of the rule "does not call upon the trial court to state to the defendant all of the acts which do or may constitute the offense." See also *People v. McKee*, 2022 IL App (2d) 210624, ¶ 38 (finding that the defendant was sufficiently informed of the "general character" of the offense).

¶ 72 We agree with these cases and conclude that the court complied with the requirement of informing defendant of the nature of the charges against him. The record shows that the court on multiple occasions informed defendant that the State was pursuing the charges on a theory of accountability. The court also explained to defendant that accessory after the fact is not available in Illinois. The court is not defendant's legal counsel and we are not aware of any obligation for the court to explain legal concepts to defendants who choose to proceed *pro se*. Nonetheless, we point out that, contrary to defendant's assertion, the court stated: "[T]hey're charging you on a

theory of accountability. *** They're charging you with that because you're responsible for the acts of your co-defendants that were committed in the course of the crime." This is a sufficient explanation of the theory of accountability.

¶ 73    Even still, defendant's July 17, 2019, motion to dismiss the charges demonstrates defendant's understanding of the theory of accountability. He stated in the motion that he "shouldn't be held accountable for what (Defendant) Menelik Jackson did" and he cites to the applicable accountability statute but suggests that his involvement should not be considered more than "mere presence at the scene of a crime." This clearly evinces that defendant was aware of the theory under which he was being charged; he simply did not agree with its application to him. See *Khan*, 2021 IL App (1st) 190679, ¶ 69 ("[T]he fact that defendant had a poor defense to the charges does not mean that defendant failed to understand the nature of the charges against him."). Further evidence bolstering our conclusion is defendant's closing argument wherein he again cites specifically to the accountability statute and argues that his mere presence at the scene does not qualify under the statute. Although he may not have fully understood the legal concept of accountability at the time he waived counsel, he was clearly informed of the theory upon which his charges were based and understood its application during trial.

¶ 74    Finally, defendant does not argue that his decision to waive counsel would have changed if he had been instructed on the legal theory of accountability. See *People v. Johnson*, 119 Ill. 2d 119, 134 (1987) (the defendant "does not assert his decision to waive counsel would have been different had he been specifically admonished regarding the possibility of a [minimum] sentence to life imprisonment"); *People v. Garcia*, 2017 IL App (1st) 133398, ¶ 22 (record indicated that the defendant had a degree of legal sophistication and wished to proceed *pro se*, which suggested that the defendant would not have changed his mind with correct sentencing admonishments). As

such, even if the court's admonishment could be considered deficient, defendant has not shown that he was prejudiced by the court's failure to explain in detail the theory of accountability. See *Pike*, 2016 IL App (1st) 122626, ¶ 112 (stating that substantial compliance with the rule occurs when any failure of the admonishments did not prejudice the defendant).

¶ 75    Thus, we conclude that defendant was adequately informed of the nature of the charges against him and the trial court substantially complied with Rule 401(a).

¶ 76    Defendant next asserts that he did not knowingly and voluntarily give up his right to counsel, as his request to proceed *pro se* was equivocal where he repeatedly requested to proceed *propria persona* or to have control over his defense but with standby counsel. He claims that the court should have clarified that he was not entitled to such assistance. Finally, he points to his statements before the court that he was forced to represent himself *pro se* because the court refused his request to proceed *propria persona*, demonstrating that he did not have a true desire to represent himself.

¶ 77    We point out that defendant does *not* contend that the trial court erred in denying him standby counsel; only that his repeated request rendered his waiver equivocal. A claim of error regarding standby counsel would be a different claim entirely, requiring a different analysis. See *Khan*, 2021 IL App (1st) 190679, ¶¶ 71-78. Thus, we restrict our analysis to whether defendant's waiver of counsel was clear and unequivocal.

¶ 78    Any waiver of the right to counsel by defendant must be "clear and unequivocal, not ambiguous." *Baez*, 241 Ill. 2d at 116. "The requirement of a clear waiver thus prevents a defendant from weaponizing his sixth-amendment rights on appeal." *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 39. Regardless of how "clear" a defendant's request for self-representation may be, the requirement that it also be unequivocal "prevent[s] the defendant from manipulating or abusing

the system by going back and forth between his request for counsel and his wish to proceed *pro se*." *People v. Mayo*, 198 Ill. 2d 530, 538 (2002). In determining whether a defendant's request is clear and unequivocal, "a court must look at the overall context of the proceedings and determine whether the defendant truly desires to represent himself and has definitively invoked his right to self-representation." *People v. Hui*, 2022 IL App (2d) 190846, ¶ 39 (citing *People v. Burton*, 184 Ill. 2d 1, 22 (1998)).

¶ 79    Defendant's assertion is belied by the record. The record shows that on numerous occasions defendant expressed a clear and unequivocal desire to represent himself. Just prior to accepting defendant's waiver of counsel, the court explicitly asked defendant if "[a]fter everything I told you[,] do you still want to represent yourself[,]" and defendant responded, "Absolutely." The court then stated that "it's not a smart idea to do this, but if you want to do it[,] I'm going to let you do it. *** You still want to do it?" Defendant again responded, "Absolutely." Further, over the course of multiple court appearances, defendant stated before the court: "I'll[*sic*] like to go *pro se*"; "I'm representing myself"; "I would like to fire this man"; and "I want to go to trial by myself, Your Honor."

¶ 80    Moreover, the court unambiguously denied defendant's request for standby counsel several times, explaining that, despite the charges being serious, the facts of the case were not overly complex and therefore, the court saw no need to appoint standby counsel. See *People v. Simpson*, 204 Ill. 2d 536, 562 (2001) ("The right to self-representation, however, does not carry with it a corresponding right to legal assistance; one choosing to represent himself must be prepared to do just that."); *People v. Ellison*, 2013 IL App (1st) 101261, ¶ 42 (a court has broad discretion in deciding whether to appoint standby counsel and may consider the gravity of the charge, the expected complexity of the proceedings, and the abilities of the defendant). The court also

explicitly informed defendant that he did not have a right to standby counsel, and the court repeatedly confirmed with defendant that he still wanted to proceed *pro se* despite not having standby counsel and he affirmed that he did. Regardless of his belief that he had a "right" to it by proceeding *propria persona*, defendant understood that he would not be receiving standby counsel.

¶ 81     In *Rainey*, 2019 IL App (1st) 160187, ¶ 66, this court explained that "a request for self-representation is not unclear or equivocal merely because it was a fallback to the defendant's first but *unavailable* choice of private counsel." (Emphasis added.) *Id.* ¶ 67. A conditional choice of self-representation does not render a request equivocal. See *id.* ¶ 67 (citing cases).

¶ 82     Here, defendant's preference to proceed with standby counsel does not render his request to proceed *pro se* equivocal. See also *People v. Black*, 2022 IL App (5th) 190386-U, ¶¶ 56-60; *People v. Dillard*, 2023 IL App (1st) 210921-U, ¶¶ 58-59. Defendant was fully aware that the court was not going to appoint standby counsel and he was aware of his options other than self-representation. These options and their advantages and disadvantages had been explained to him *ad nauseum*. For defendant to now claim that his waiver of counsel was not clear and unequivocal and made knowingly and intelligently is untenable. As such, defendant's knowing and voluntary election to represent himself is honored. *Haynes*, 174 Ill. 2d at 235; see also *Lego*, 168 Ill. 2d at 564 ("If the request is made freely, knowingly, and intelligently, it must be accepted.").

¶ 83     Defendant's subsequent conduct also supports a finding of a clear and unequivocal waiver of counsel. "When determining whether a defendant seeks to relinquish counsel, a court may look at the defendant's conduct following his request to represent himself." *Hui*, 2022 IL App (2d) 190846, ¶ 48 (citing *Burton*, 184 Ill. 2d at 23-24). Here, even before his waiver of counsel was accepted, defendant attempted to file a number of *pro se* motions, including a motion to dismiss

the indictment. After the court accepted his request to proceed *pro se*, defendant filed motions that included citations to legal authority at most, if not all, court appearances.

¶ 84    Accordingly, defendant's waiver of counsel was clear and unequivocal and there was no error. Because the trial court committed no error, plain in error review is unnecessary. (See *People v. Brant*, 394 Ill. App. 3d 663, 677 (2009) (in the absence of error, there can be no plain error). We, therefore, honor the procedural bar and hold that defendant's claim of error is forfeited.

¶ 85                                B. Sufficiency of the Evidence

¶ 86    Defendant next argues that the evidence was insufficient to find him guilty beyond a reasonable doubt of first degree murder, aggravated battery, and aggravated discharge of a firearm. Specifically, he contends that the State failed to show that he was accountable for Jackson's actions of shooting at the car, killing Rivera, and injuring Sierra.

¶ 87    When a defendant challenges the sufficiency of the evidence against him, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins,* 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 88    The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. A person commits the offense of first degree murder where

he intends to kill or do great bodily harm, or knows that his acts will cause death, or knows that such acts create a strong probability of death or great bodily harm, or is committed during the course of another felony. 720 ILCS 5/9-1(a)(1), (2), and (3) (West 2018). A person commits aggravated battery, as relevant here, when, in committing a battery, he or she knowingly discharges a firearm *** causing injury to another person. 720 ILCS 5/12-3.05(e)(1) (West 2018). A person commits aggravated discharge of a firearm, as applicable here, when he or she knowingly and intentionally discharges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person. 720 ILCS 5/24-1.2(a)(2) (West 2018).

¶ 89    Notably, defendant does not claim that the proof of the elements of these offenses was insufficient, but solely argues that he was not proven accountable for the actions of the shooter, Jackson. There is no dispute that Jackson fired several shots into Rivera's car killing Rivera and seriously injuring Sierra. As such, we focus our analysis on the accountability determination.

¶ 90    To prove that a defendant possessed the intent to promote or facilitate the commission of the crime, the State must demonstrate that "either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13. The accountability statute (720 ILCS 5/5-2 (West 2018)) provides:

"A person is legally accountable for the conduct of another when:

***

(c) either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.

When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability."

¶ 91    "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d 307, 338 (1995). In establishing accountability, the State need not present evidence of a verbal agreement between co-offenders (*People v. Perez*, 189 Ill. 2d 254, 267 (2000)), nor show that the defendant directly participated in the perpetration of the criminal act (*W.C.*, 167 Ill. 2d at 338)). As the statute provides, mere presence at the scene of the crime is insufficient to establish accountability; however, a defendant's presence may be considered in conjunction with other factors surrounding the commission of the crime. *W.C.*, 167 Ill. 2d at 338. Factors that the trier of fact may consider in determining accountability are: (1) the defendant's presence during the planning of the crime; (2) his presence during the commission of the crime; (3) his flight from the scene; (4) his failure to report the incident; and (5) his continued association with the principal after the commission of the crime. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996).

¶ 92    Defendant contends that the evidence showed that he had a minimal role in the shooting and was merely a bystander who did not know codefendants or the victims. He argues the evidence also showed that he believed that only a fight between the codefendant and victims might ensue,

he did not know that Jackson had a gun, he fled the scene separately from codefendants, and he did not give any instruction to Jackson.

¶ 93   Defendant relies on *People v. Johnson*, 2014 IL App (1st) 122459-B, to support his argument that there was insufficient evidence presented to show defendant shared the same intent as Jackson. He also cites to *People v. Estrada*, 243 Ill. App. 3d 177 (1993), and *People v. Wilson*, 2020 IL App (1st) 162430, as analogous cases.

¶ 94   In response, the State contends that the evidence established that defendant aided in the commission of the offenses where he accompanied Jackson to the location of Rivera's parked car and he pointed out the victims to Jackson. This evidence, the State argues, established that defendant and Jackson shared a common criminal design to shoot the victims. Based on the record before us, we agree with the State.

¶ 95   Here, the evidence at trial established that, shortly before the shooting, defendant saw the victims, who he admitted were Hispanic, walking on Clark, and moments later, he spoke with Jackson and Washington near Jackson's truck. The video evidence showed defendant and Jackson walking together towards Rivera's car, which Salmakeev described as "acting like they were on a mission," and defendant stopping in front of the car and pointing a bottle towards the victims. The video further showed that defendant looked over his shoulder, seemingly to ensure no one else was around. There was also evidence that one of the passengers heard someone say "Blow those b***" and Salmakeev saw defendant and Jackson exchange words just prior to the shooting. Police officers also testified that the video showed words exchanged between the two individuals. Considering the only two individuals outside of the car were Jackson and defendant, and Jackson was the shooter, it would be reasonable for the jury to infer that those had been defendant's words. Afterwards, defendant ran away from the scene, discarded the bottle, did not report the shooting,

and when he was detained, lied about his presence at the shooting and did not identify or describe the actual shooter. See *Batchelor*, 171 Ill. 2d at 377-78 (finding that evidence that the defendant fled from the scene of the crime and never reported the crime are facts the trier of fact may consider in determining whether accountability exists).

¶ 96 Moreover, we have defendant's interview in which defendant admitted that he, Jackson, and Washington were all members of the Gangster Disciples and the gang had a code, meaning that he was not going to let "Mexicans" beat up a "black" person. Defendant also admitted that Jackson and Washington told defendant that they been "jumped" by some "Mexicans" and they were trying to find them. Additionally, defendant repeatedly informed the detectives that he offered his assistance to Jackson and Washington. These facts support an inference that defendant was not merely a bystander at the scene of the shooting but that he was an active participant.

¶ 97 Even assuming defendant's statements that he did not know that Jackson had a gun and that he believed Jackson only intended to fight the intended victims are true, they do not absolve him of accountability for the offenses or negate the proof of a common criminal design. See *W.C.*, 167 Ill. 2d at 338 ("[T]he fact that the criminal acts were not committed pursuant to a preconceived plan is not a defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group."); see also *Fernandez*, 2014 IL 115527, ¶ 19 ("[T]here is no question that one can be held accountable for a crime other than the one that was planned or intended, provided that it was committed in furtherance of the crime that *was* planned or intended." (Emphasis in original.)).

¶ 98 Regardless, the jury was aware of these statements minimizing defendant's involvement and had the discretion to assess defendant's credibility and resolve the conflicts in the evidence. See *People v. Williams*, 193 Ill. 2d 306, 338 (2000). We will not second guess the jury's

determination on such matters (*People v. Corral*, 2019 IL App (1st) 171501, ¶ 71), and further, a reviewing court is not required to search out all possible explanations consistent with innocence or be satisfied as to each link in the chain of circumstances (*People v. Wheeler*, 226 Ill. 2d 92, 114 (2007)). In sum, viewing the evidence in the light most favorable to the State, we find the evidence sufficient to prove defendant was accountable for the actions of his codefendants.

¶ 99    We further agree with the State that *Estrada*, 243 Ill. App. 3d at 185, is inapposite. In that case, the defendant exited the car brandishing a tire iron and his codefendant fired a gun at the victim. *Id.* at 185. This court reversed the conviction finding that, for accountability to apply, the defendant must have "some advance knowledge of the criminal plan or scheme" and there was "no direct evidence" that the defendant participated in a common plan or design to shoot the victim; rather, his acts only indicated "that he intended to intimidate" the victim. *Id.* at 184-185. In contrast, here, there was evidence that defendant conferred with Washington and Jackson just prior to the shooting, led Jackson to Rivera's car, and pointed out the targets to Jackson. As such, we find *Estrada* factually distinguishable.

¶ 100   Additionally, *Estrada* was issued prior to *Fernandez*, a case in which our supreme court clarified the law on accountability. In *Fernandez*, the supreme court held that the accountable party does not have to have prior knowledge of the actual crime committed by the other party, only that the accountable party aids the other party in furtherance of the planned and intended act. *Fernandez*, 2014 IL 11552, ¶¶ 19-21. In so holding, the supreme court explicitly overruled *People v. Phillips*, 2012 IL App (1st) 101923, ¶ 15 (holding that, in accountability cases, a defendant is legally accountable only for the crimes he specifically intends to help his companions commit). *Fernandez*, 2014 IL 115527, ¶ 15. It is doubtful that the same disposition in *Estrada* would yield had it been decided after *Fernandez*. Under the current accountability jurisprudence, it is possible

that the defendant in *Estrada* would have been found accountable for the actions of the shooter. Regardless, *Estrada* is inapposite.

¶ 101   We also find *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 73, distinguishable where this court found that "the State presented nothing concrete" to support the theory that the defendant and codefendant shared a common plan to rob and shoot the victim. In particular, there was only evidence that the defendant was in the vehicle with the victim and the codefendant when the codefendant committed the crimes and that they ran in the same direction afterwards but not together. *Id.* ¶¶ 68-70. There was no evidence that he had been with the codefendant immediately preceding the crimes or that he knew what the codefendant had planned and no suggestion that he maintained a close association with the codefendant after the shooting. *Id.* ¶¶ 70-73. As such, the court found the evidence "utterly lacking." *Id.* ¶ 73. Here, as we have explained, there was concrete evidence that defendant was working with Jackson, as they had a conversation prior to shooting, defendant admitted to offering his codefendants assistance, defendant led Jackson to the vehicle, and defendant pointed at the victims as Jackson shot into the car.

¶ 102   Finally, *Johnson* is similarly factually distinguishable. There, the defendant was driving around the neighborhood with a friend, picked up the shooter, and stopped by the victim's car to ask if he had any marijuana. 2014 IL App (1st) 122459-B, ¶ 7. The shooter stepped out of the car and shot the victim several times before getting back in the car and the defendant drove away. *Id.* ¶ 1. This court found that the State failed to prove that the defendant was accountable for the shooter's actions, finding that there was no evidence that the defendant knew of the shooter's intentions when he exited the car, the defendant did nothing to facilitate the crime, defendant's actions were merely directed at driving away from the crime, and the defendant did not know the shooter was armed. *Id.* ¶ 158. Defendant contends that, as in *Johnson*, there was insufficient

evidence to show that he shared Jackson's intent to shoot the victims. However, contrary to *Johnson*, this case is premised on common criminal design, not shared intent. Additionally, for the same reasons as above, we find the facts of this case distinguishable from those in *Johnson*.

¶ 103   Rather, we find *People v. Phillips*, 2014 IL App (4th) 120695, to be more closely aligned to the case at bar. In that case, the defendant and his friend went to the house of a woman who had fought with the defendant's ex-girlfriend earlier that day. *Id.* ¶ 1. His friend, anticipating a need for crowd control, brought a rifle. *Id.* Upon arriving, they realized the crowd was already too large and they decided to abandon the plan to attack the woman; however, before leaving, defendant's friend fired a single shot in the direction of the crowd, which struck and killed the victim. *Id.* The defendant later threw the rifle in a river upon learning of the victim's death. *Id.* These facts were largely undisputed and the defendant was found guilty of first degree murder and unlawful possession of a weapon by a felon. *Id.* ¶ 2. As this court succinctly concluded, in affirming the defendant's conviction:

> "[D]efendant cannot escape liability merely because his criminal intentions did not rise to the level of murder. By attaching himself to a group bent on illegal acts, defendant become accountable for all the crimes of his companions, including the shooting of [the victim]." *Id.* ¶ 34.

¶ 104   Similarly, here, defendant admitted that he believed Jackson's intentions were to fight these individuals in the car, and he accompanied Jackson and pointed the victims out to Jackson. Although defendant apparently did not expect Jackson to murder anyone, he cannot escape liability for his actions in aiding Jackson. Defendant joined the group, offered his assistance, and actively participated in the crimes that occurred regardless of his own perception of the plan. As such, there

was sufficient evidence that he and Jackson shared a common design and the State established defendant's accountability for the crimes.

¶ 105   Accordingly, we conclude that the evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt of first degree murder, aggravated battery, and aggravated discharge of a firearm.

¶ 106                              C. Closing Argument

¶ 107   Lastly, defendant argues that he was denied a fair trial when, during closing argument and in rebuttal, the prosecutor commented on his self-representation and his character. Specifically, he points to the prosecutor's remarks to the jury that defendant's conduct during the trial showed his propensity to insert himself into situations, making him accountable for the shooting. He additionally points to the prosecutor's remarks that the victims were assets to society and defendant is not as improper.

¶ 108   Once again, defendant failed to preserve this claim of error by objecting to the comments contemporaneously and by including it in a posttrial motion. As such, defendant requests relief under the plain error doctrine. We must first determine whether any error occurred during closing arguments. See *People v. Williams*, 193 Ill. 2d 1, 27 (2000) (stating that it is appropriate to first determine whether error occurred at all).

¶ 109   Closing arguments provide the parties "with a final opportunity before the jury to review the admitted evidence, to explain the relevant law, and to assert why the evidence and the law compel a favorable verdict." *People v. Williams*, 2022 IL 126918, ¶ 40. A prosecutor has wide latitude in closing argument and may comment on the evidence and any reasonable inferences that arise therefrom, even if those inferences negatively reflect on defendant. *Id.* ¶ 44. The prosecutor may also respond to comments made by the defense which clearly invite response and comment

on the credibility of witnesses. *People v. Rader*, 178 Ill. App. 3d 456, 466 (1988). However, "[a] prosecutor may not make statements in his closing argument designed solely to inflame the passion or arouse the prejudices of the jury." *Id.* at 467. Regardless, "[c]omments in closing argument must be considered in the context of the entire closing argument of both the State and the defendant." *People v. Ceja*, 204 Ill. 2d 332, 357 (2003).

¶ 110   Our supreme court has recently set forth the appropriate standard of review as a "two-step process for determining whether a trial court's decision to overrule a defendant's objection to a prosecutorial comment in closing argument is reversible error." *Williams*, 2022 IL 126918, ¶ 41. A reviewing court will first determine whether the defendant has demonstrated that the remarks were improper. *People v. Jackson*, 2020 IL 124112, ¶ 83. If the remarks were improper, then the reviewing court determines whether they were so prejudicial that real justice was denied or the verdict resulted from the error. *Id.*

¶ 111   In this case, we do not find that any of the challenged comments were improper or resulted in error. We address the challenged comments in turn.

¶ 112 First, defendant contends that the prosecutor improperly commented on his self-representation and character during closing and rebuttal arguments. Specifically, he points to the following comment during closing argument: "He inserted himself. And you've watched him all week. Does that surprise you? He approached Jackson and Washington and asked if they need him to assist." In rebuttal, the prosecutor stated:

> "I mean, because the defendant has acted as his own attorney, you've had a chance
>
> to watch this guy for a week. And you've seen his actions and mannerisms. You saw the
>
> videotape of his yelling and pointing, and you've seen him in court yelling and pointing.

You saw him in jury instructions when he is asking you what…He knew what type of confrontation he was getting into."

¶ 113 Prosecutors may properly comment unfavorably on the defendant, the violence of the crime, and the benefits of the administration of the law. *Hope*, 116 Ill. 2d at 277-78. Additionally, this court has held that it is not improper for a prosecutor to address a defendant's self-representation during closing arguments. See *People v. Tatum*, 389 Ill. App. 3d 656, 672 (2009) (finding no error where the prosecutor stated that the defendant was manipulating the proceeding by his self-representation and the record showed the defendant was disruptive and disrespectful during the trial); *People v. Palmer*, 382 Ill. App. 3d 1151, 1161 (2008) (finding similar prosecutorial remarks regarding the defendant's self-representation to be proper and explanation of the *pro se* situation was appropriate). In regards to rebuttal, it is proper for the State to respond to comments made by the defense that clearly invite a response. *People v. Hudson*, 157 Ill. 2d 401, 444 (1993).

¶ 114 Here, the challenged comments were not geared towards persuading the jury that defendant's choice of self-representation in itself was an issue but that because of defendant's self-representation, they were better able to observe defendant's behavior in concert with the evidence against him. We do not see anything improper in directing the jury to their own observations during trial. Defendant also overlooks that at the beginning of the State's rebuttal, the prosecutor remarked that the jury should not hold defendant's self-representation "for or against him" or "let that influence your decision." Moreover, defendant referred to his own self-representation multiple times in his closing argument. See *Rader*, 178 Ill. App. 3d at 466 ("When a defendant's own argument invites statements in rebuttal, the defendant cannot then complain of those statements.").

Thus, the comments in rebuttal were an invited response. As such, we find nothing improper with the prosecutor's comments on defendant's self-representation.

¶ 115   We also briefly address defendant's argument that the State's comment in rebuttal violated Illinois Supreme Court Rule 404(b), barring evidence of a defendant's other crimes, wrongs, or acts to show defendant's propensity to commit crimes. Ill. S. Ct. R. 404(b) (eff. Jan. 1, 2011). However, Rule 404(b) is simply not applicable here. We are aware of no case, and defendant cites to none, holding that a defendant's behavior in court and his self-representation qualifies as other crimes or bad acts evidence. As such, this argument fails.

¶ 116   Next, defendant challenges the following comment during the State's rebuttal:

> "He also said he is an asset to society. Who is an asset to society? Is it John Rivera and Jack Hightower who are police officers and protect us[?] Is it Ruben Sierra who served his country in the military? Is it Sara Garcia helping patients out at a hospital?"

He argues that this comment was the prosecutor's improper attempt to "unfairly exploit[ ] the jurors' emotions."

¶ 117   However, during his closing argument, defendant referred to himself as an asset to the community because he has saved multiple people from crimes and portrayed himself as a "victim" due to his upbringing and his prior drug addiction. Defendant's statements during closing argument clearly invited this response from the State. See *People v. Vargos*, 409 Ill. App. 3d 790, 797 (2011) (stating that the "prosecutor's remarks on rebuttal will not be deemed improper where the record reveals they were the product of defense counsel's provocation or invitation"). As such, the intent of the prosecutor's statements was not to arouse the prejudices of the jury, and, in fact, the prosecutor's comments were focused on the victims, rather than defendant. Because we do not find these remarks improper, there is no error.

¶ 118  Finally, defendant suggests that the effect of the several improper comments was cumulative error. Because we do not find any of the prosecution's comments to be improper, there can be no cumulative error.

¶ 119  Accordingly, we reject defendant's argument that the comments made during closing and rebuttal arguments rendered his trial unfair. Because we find no error, again, we must honor the procedural bar and deem defendant's claimed errors forfeited.

¶ 120                              III. CONCLUSION

¶ 121  For the reasons stated, we affirm the judgment of the circuit court.

¶ 122  Affirmed.